IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| JAMES STEVENS *et al.*, : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | CASE NO.: 7:24-CV-00027 (WLS) |
| : | |
| 3 SQUARES DINER LLC, : | |
| : | |
| Defendant. : | |
| : | |

**ORDER**

Before the Court is the Parties' Joint Motion for Preliminary Approval of Collective Action Settlement Agreement (Doc. 36) ("the Motion for Preliminary Approval"). For the reasons discussed herein, the Motion is **GRANTED**.

**I. BACKGROUND**

This is a Fair Labor Standards Act ("FLSA") case against Defendant 3 Squares Diner LLC ("Defendant"), a company which owns and operates a chain of 24-hour diner restaurants throughout southwest Georgia. (Doc. 1 ¶ 11). Plaintiff James Stevens ("Plaintiff Stevens"), a former employee of Defendant, filed the Complaint (Doc. 1) on March 22, 2024. Therein, Plaintiff Stevens alleges that Defendant violated the FLSA by failing to pay Plaintiff Stevens and other similarly situated employees overtime, and unlawfully deducting 30-minute lunch breaks from Plaintiff Stevens and such other employees' wages, while requiring them to work during the same period. (*Id.* ¶¶ 3–4). Plaintiff Stevens brings a putative FLSA collective action seeking unpaid wages, liquidated damages, and attorneys' fees and costs. (*Id.*)

Since the lawsuit was filed on March 22, 2024, (Doc. 1), a number of Plaintiffs have opted in to the lawsuit. (*See generally* Docs. 6, 7, 17, & 18). These Plaintiffs include: Jessica McCall, Briana Palmer, Breanna Hobgood, Santanna Hobgood, Brandy Apperson, and Janice Wilson. (*Id.*)

On October 14, 2024, Plaintiffs filed a Motion for Conditional Certification (Doc. 24). Initially, Defendant opposed the Motion for Conditional Certification. (*See generally* Doc. 26).[1] However, on December 18, 2024, Plaintiffs filed a Notice of Settlement (Doc. 32). In an Order (Doc. 33) entered on December 20, 2024, the Court denied Plaintiffs' Motion for Conditional Certification as moot and ordered the Parties to submit settlement documents. On February 5, 2025, the Parties filed the instant Motion for Preliminary Approval.

## II.   THE MOTION FOR PRELIMINARY APPROVAL

### A.   Legal Framework

The FLSA allows employees deprived of wages or overtime compensation to sue their employers for damages on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). "Congress passed the FLSA to protect workers from overbearing practices of employers who had greatly unequal bargaining power over their workers." *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 920 (11th Cir. 2014) (citing *Roland Elec. Co. v. Walling*, 326 U.S. 657, 668 n.5 (1946)). Generally, FLSA plaintiffs should be given the opportunity to proceed collectively. *Id.* (citing 29 U.S.C. § 216(b) and *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989)). Such a collective action mechanism "(1) reduc[es] the burden on plaintiffs through the pooling of resources, and (2) efficiently resolv[es] common issues of law and fact that arise from the same illegal conduct." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1264 (11th Cir. 2008) (citing *Hoffman-La Roche*, 493 U.S. at 170). Unlike a Fed. R. Civ. P. 23 class action, a putative FLSA collective action plaintiff must choose to affirmatively join the class by filing his or her written consent to be bound by the judgment. 29 U.S.C. § 216(b); *Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1215 (11th Cir. 2001). A district court may authorize notice to potential opt-in plaintiffs in "appropriate" cases. *Hoffman-La Roche*, 493 U.S. at 169.

In the Eleventh Circuit, courts use a two-part approach to notice and certify an FLSA collective class. *Hipp*, 252 F.3d at 1218 (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995)). At the first stage, the court should determine whether a class should be "conditionally certified." *Morgan*, 551 F.3d at 1264. At this stage, plaintiffs bear the burden of showing a "reasonable basis" for their claim that there are other similarly situated employees

---

[1] As the Court discusses below, Defendant no longer opposes conditionally certifying an FLSA collective. (*See* Doc. 36-2 at 8).

2

who wish to opt in. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996)) (citing *Hipp*, 252 F.3d at 1215). Courts employ a "fairly lenient standard" at this initial stage, *Morgan*, 551 F.3d at 1261, and may make a determination on plaintiffs' pleadings and the affidavits in the record—provided those pleadings and affidavits provide a "reasonable basis" for that determination. *Id.* at 1262 n.41.

The second stage is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Hipp*, 252 F.3d at 1218. The second stage requires more than 'allegations and affidavits' to maintain certification. *Morgan*, 551 F.3d at 1261 (quoting *Anderson*, 488 F.3d at 953). Rather, the court may consider factors such as "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *See id.* (quoting *Anderson*, 488 F.3d at 953).

In their Motion for Preliminary Approval (Doc. 36), the Parties first seek conditional certification of their proposed FLSA Collective. (*Id.* at 1) Then, if the Court certifies the proposed Collective, the Parties seek preliminary approval of the agreement, appointment of class counsel, and approval of their proposed notice procedures. (*Id.*) Courts in the Eleventh Circuit have generally permitted such "a modified version of the general two-tiered approach to FLSA settlements." *See e.g.*, *Lochren v. Horne LLP*, No. 6:21-cv-1640, 2023 WL 7411114, at *4 (M.D. Fla. Sept. 19, 2023) (collecting cases), *report and recommendation adopted*, 2023 WL 9792603 (M.D. Fla. Nov. 20, 2023). With this standard in mind, the Court turns to the merits of the Parties' Motion for Preliminary Approval.

B.   **Conditional Certification for Purposes of Settlement**

The Parties first ask the Court to conditionally certify their proposed Collective for purposes of settlement. (Doc. 36 at 1). Specifically, they seek to certify the following Collective: "All hourly, non-exempt employees who worked at 3 Squares restaurant locations as line cooks or servers, from April 1, 2022 through February 5, 2025, who were subject to the deduction of 30 minute unpaid meal period(s) from their wages." (*Id.*) In arguing that the Court should certify the proposed Collective, the Parties rely on the arguments and affidavits submitted in support of Plaintiffs' Motion for Conditional Certification (Doc. 24). Although at the time of

3

Plaintiffs' Motion for Conditional Certification, Defendant opposed certification, (*see generally* Doc. 26), Defendant no longer opposes that certification for purposes of settlement. (*See* Doc. 36-2 at 8).

1. **Provisional Factual Findings**

The following facts are derived from the Pleadings, (Docs. 1 & 8), Plaintiffs' Motion for Conditional Certification (Doc. 24), Defendant's Response (Doc. 26), Plaintiffs' Reply (Doc. 29), the Motion for Preliminary Approval, and the sworn affidavits attached to those filings. The facts as stated in this Order are not intended, nor should they be construed, as an ultimate finding as to any fact as may be determined at a later stage in the proceeding or at trial.

On February 7, 2022, Defendant incorporated as a business registered to conduct business in Georgia. (Doc. 26-2 ¶ 2). Over the next year or so, Defendant purchased 10 restaurant locations throughout southwest Georgia and used the locations to open 3 Squares Diner restaurants. (*Id.* ¶¶ 2–8). One of these locations was in Moultrie ("the Moultrie Location"). (*Id.* ¶ 6). The Moultrie location was previously a Huddle House restaurant, but Defendant acquired the location on July 1, 2023, through an asset-only purchase agreement with its previous owners and operators. (Doc. 26-2 ¶ 6). As part of the acquisition, Defendant hired staff who had previously worked at the Huddle House to continue on at the new 3 Squares Diner location. (*Id.*)

   a. **Line Cooks**

From July 1, 2023, to August 12, 2023, Defendant employed Plaintiff Stevens as a "Line Cook" at the Moultrie location. (Doc. 24-3 ¶ 3); (Doc. 26-2 ¶ 14). According to Plaintiff Stevens's affidavit, while he was employed as a Line Cook, he "regularly worked more than 40 hours per week and [is] aware of other employees who also worked more than 40 hours per week." (Doc. 24-3 ¶ 4). "I observed that 3 Squares Diner . . . automatically deducted 30 minutes from other servers and cooks' pay for meal periods even though they were also required to perform work during part of or the entirety of their meal period." (*Id.* ¶ 11). Opt-in Plaintiff Brandy Apperson ("Opt-in Plaintiff Apperson"), was also a Line Cook at the Moultrie location in 2023, although she was employed in other roles at the location as well. (*See* Doc. 24-6 ¶¶ 2–3). Opt-in Plaintiff Apperson joins Plaintiff Stevens in averring that she regularly worked

4

more than 40 hours per week, and Defendant deducted 30-minutes from her pay each day for a meal period even though she was required to work during that period. (*Id.* ¶¶ 4, 8).

A Line Cook at a 3 Squares restaurant is generally responsible for food preparation. (Doc. 26-1 at 7). Line Cooks earn between $10.00 and $13.50 per hour. (Doc. 26-2 ¶ 9). While Plaintiffs Apperson and Stevens worked as Line Cooks, they reported to the manager of the Moultrie Location. (Doc. 24-6 ¶ 5). Each Line Cook reported to the restaurant manager "and were subject to the same work rules, policies and procedures." (Doc. 24-3 ¶ 6); (Doc 24-6 ¶ 6).

### b. Servers

Opt-in Plaintiff Janice Wilson ("Opt-in Plaintiff Wilson"), Jessica McCall and Brianna Palmer worked as servers at the Moultrie location. (Doc. 24-4 ¶ 3); (Doc. 24-5 ¶ 3); (Doc. 24-7 ¶ 7). Each aver that they too worked more than 40 hours per week and that Defendant deducted pay for meal periods while requiring them to work during that period. (Doc. 24-4 ¶¶ 4–5); (Doc. 24-5 ¶¶ 4, 7–8); (Doc. 24-7 ¶¶ 4, 7–8). Servers are paid between $2.13 and $3.25 per hour, plus tips, and are generally responsible for greeting customers, preparing tables, taking orders, delivering food, processing payments, and maintaining the dining area. (Doc. 26-1 at 6); (Doc. 26-2 ¶ 9). Each Server reported to the restaurant manager "and [was] subject to the same work rules, policies and procedures." (Doc. 24-4 ¶¶ 5–6); (Doc 24-5 ¶ 6); (Doc. 24-7 ¶ 6).

### 2. Similarly Situated Employees

As noted, for plaintiffs to maintain a collective action under § 216(b), they must demonstrate that they are similarly situated. 29 U.S.C. § 216(b). The FLSA's text "does not define how similar the employees must be before the case may proceed as a collective action. And [the Eleventh Circuit] has not adopted a precise definition of the term." *Morgan*, 551 F.3d at 1259. Even so, the Eleventh Circuit requires that "a district court . . . satisfy itself that there are other employees who desire to opt-in and who are similarly situated with respect to their job requirements and with regard to their pay provisions." *Id.* (citing *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)). There is no requirement, however, that each employee in the putative collective action holds identical positions. *Id.* (citing *Grayson*, 79 F.3d at 1096).

5

In the absence of clear Circuit guidance after *Morgan*, district courts in this Circuit have adopted various tests to analyze whether employees are similarly situated. *Compare Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 676–77 (S.D. Fla. 2013) *with Page v. I Love Suishi, Inc.*, No. 5:16-CV-01146, 2018 WL 11453813, at *2–3 (N.D. Ala. Aug. 14, 2018). The Court, however, is persuaded by the factor-based approach to analyzing whether employees are similarly situated that has been consistently employed throughout the Eleventh Circuit. *See e.g.*, *Martin v. Budd Props., Inc.*, No. 7:17-CV-27, 2018 WL 6521475, at *4 (M.D. Ga. Apr. 27, 2018) (Sands, J.) (citing *Rojas*, 297 F.R.D. at 677); *Taylor v. White Oak Pastures, Inc.*, 454 F. Supp. 3d 1317, 1332 (M.D. Ga. 2020) (Gardner, J.) (citing *Whineglass v. Smith*, No. 8:11-cv-2784, 2013 WL 2237841, at *7 (M.D. Fla. May 21, 2013) and *Stone v. First Union Corp.*, 203 F.R.D. 532, 542–43 (S.D. Fla. 2001)). Under such an approach, a court considers factors such as:

> (1) whether all plaintiffs held the same job titles;
> (2) whether the plaintiffs worked in the same geographic location;
> (3) whether the alleged violations occurred during the same time period;
> (4) whether the same policies and practices governed plaintiffs and whether the same decision-maker established these policies and practices in the same manner; and
> (5) the extent to which the alleged violations are similar.

*Taylor*, 454 F. Supp. 3d at 1332.

These factors are "guideposts[,]" with no single factor being dispositive, and the factors taken as a whole are not necessarily determinative of status as similarly situated employees. *See e.g.*, *I Love Sushi*, 2018 WL 11453813, at *3 (quoting *Alequin v. Darden Rests., Inc.*, No. 12-61742, 2013 WL 3939374, at *4 (S.D. Fla. July 12, 2013)). The Court finds the factors to be a useful framework in analyzing the proposed class.

Here, the Parties have carried their burden to show that the proposed Collective is similarly situated for three reasons.

First, the employees in the proposed Collective were subjected generally to "the same work rules, policies and procedures," (*see e.g.*, Doc. 24-3 ¶ 6); (Doc. 24-4 ¶ 6), and the asserted FLSA violations stem from the policies in question. (*See* Doc. 24-3 ¶¶ 7–8); (Doc. 24-4 ¶¶ 7–8); (Doc. 24-5 ¶¶ 7–8); (Doc. 24-6 ¶¶ 7–8); (Doc. 24-7 ¶¶ 7–8). Specifically, members of the proposed Collective record their hours into the same system to be accessed and edited by a

6

shared supervisor—the General Manager. (*See* Doc. 26-2 ¶ 22) ("As a General Manager [Plaintiff Stevens] could access and edit the time records for employees at the Moultrie location."); (Doc. 24-5 ¶ 6) ("All of the other line cooks/servers that worked at my 3 Squares Diner location had to report to the same supervisor . . . ."). Although being subject to the same objected-to-policy is not the only factor in the "similarly situated" inquiry, it is often treated as a focal point of the inquiry—particularly at the conditional certification stage. *See e.g.*, *Campo v. Granite Servs. Int'l, Inc.*, 584 F. Supp. 3d 1337, 1342–43 (N.D. Ga. 2022). As such, the fact that Line Cooks and Servers were subject to the same timekeeping procedures, and the asserted FLSA violation stems from those procedures, significantly weighs in favor of a finding of similarity.

Second, the asserted violations are nearly identical—all stemming from a practice of improperly deducting meal periods while requiring the employee to work through that meal period, thereby forcing the employee to work overtime without appropriate compensation. (Doc. 24-3 ¶ 8) ("When I worked at 3 Squares Diner they automatically deducted 30 minutes from my pay each day that I worked for a meal period even though I often did not receive a meal period . . . ."). From the Record before the Court, the claims asserted by Line Cooks and Servers are indistinguishable—weighing in favor of a finding of similarity.

Third, the asserted violations of both Line Cooks' and Servers' FLSA rights occurred within a similar time period. From the Court's review of the submitted declarations, each Line Cooks and Server was employed in 2023, with most being employed in the latter part of the year. (*See e.g.*, Doc. 24-3 ¶ 3) ("From July 1, 2023 through August 12, 2023 I worked as a line cook . . . ."); (Doc. 24-4 ¶ 1) ("I was employed by 3 Squares Diner, LLC between July 2023 and October 2023"). Those employees aver that the violations occurred throughout their employment as Line Cooks and Servers. (*See e.g.*, Doc. 24-7 ¶ 8) ("When I worked for 3 Squares Diner I was not provided with meal periods during which I was completely relieved from duty. Instead I was regularly required to work through my meal period."). This too weighs in favor of a finding of similarity.

Taken together, the Court finds that the Parties have met their burden to show a reasonable basis to treat the proposed Collective employees as similarly situated. Accordingly,

the Court **CONDITIONALLY CERTIFIES** the following class as an FLSA collective action for settlement purposes only, with the collective defined as:

> All hourly, non-exempt employees who worked at 3 Squares restaurant locations as line cooks or servers, from April 1, 2022 through February 5, 2025, who were subject to the deduction of 30 minute unpaid meal period(s) from their wages.

("the Collective").

### B. Notice to the Collective

Having conditionally certified the Collective, "the Court must determine the appropriate notice to potential § 216(b) class members and 'establish the specific procedures to be followed with respect to such possible "opting-in."'" *Pettiford v. Bigham Cable Constr. Inc.*, No. 1:18-CV-109, 2020 WL 13468886, at *3 (M.D. Ga. Apr. 17, 2020) (quoting *Dybach*, 942 F.2d at 1568).

Here, the Parties propose a sixty-day notice period for potential plaintiffs to join the action for settlement purposes. (Doc. 36-3 at 11, 19). The settlement administrator shall mail a notice packet to all members of the Collective by first class mail or email. (*Id.*) The proposed notice contains a summary of the action, a description of the Settlement Agreement, directions for participation in the action, an explanation of the effect of joining or not joining the action and settlement, a description of a Collective member's right to object to the terms of the Settlement Agreement, contact information for class counsel, and directions for obtaining more information for Collective Members. (*Id.* at 18–21). The Notice affords Collective Members 60 days from the postmarked date of the Notice to opt-in to the action, if they wish to do so. (*Id.* at 19). During this period, they may also file an objection to the Settlement Agreement. (*Id.* at 20). Upon careful review of the proposed notice procedures, the Court finds them to be sufficient and appropriate and authorizes the Parties to notice the Collective members in accordance with the procedures described in the Settlement Agreement.

### C. The Proposed Settlement Agreement

Turning to the proposed Settlement Agreement (Doc. 36-3 at 1–16), the Parties request the Court "preliminarily approve the terms of the [proposed] Settlement Agreement as a fair, reasonable, and adequate resolution of a bona fide dispute between the Parties[.]" (Doc. 36 at 1).

8

### 1. Settlement Approval Legal Framework

Before approving an FLSA settlement, the Court must review it to determine if it is "a fair and reasonable resulution [sic] of a bona fide dispute." *Lynn's Food Stores v. United States*, 679 F.2d 1350, 1354–55 (11th Cir. 1982). Judicial review is required because the FLSA's purpose is to protect employees from substandard wages and oppressive working hours and to prohibit the contracting away of their rights. *Id.* at 1352 (citing *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981)). If the settlement reflects a reasonable compromise over issues that are actually in dispute, a court may approve the settlement "in order to promote the policy of encouraging settlement of litigation." *Id.* at 1354.

Although *Lynn's Food* announces the requirement that a private compromise of an FLSA claim requires court approval, and prescribes the "fair and reasonable resolution" standard, the case provides little guidance for evaluating the fairness of a proposed comprise in a different case. *See Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1240 (M.D. Fla. 2010) (citing *Lynn's Food*, 679 F.2d at 1354). And the Court's review of subsequent Eleventh Circuit decisions reveals that the authority is persistently vague in defining the appropriate considerations when scrutinizing FLSA agreements for fairness. Nevertheless, district courts throughout the Eleventh Circuit have generally applied a persuasive two-step approach in applying the *Lynn's Food* fairness standard. *See e.g.*, *Gamble v. Air Serv Corp.*, 247 F. Supp. 3d 1302, 1305–05 (N.D. Ga. 2017) (quoting *Dees*, 706 F. Supp. 2d at 1241); *Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1350 (M.D. Fla. 2010); *Gardner v. Sandestin Beach Hotel, Ltd.*, No. 3:23cv05122 at *2 (N.D. Fla. May 29, 2024)).

First, a reviewing court should evaluate factors "internal to the compromise." *Dees*, 706 F. Supp. 2d at 1241 (internal quotation marks removed). That is, "whether the compromise is fair and reasonable to the employee[.]" *Id.* Second, if a compromise is reasonable to the employee, the reviewing court should evaluate "whether the compromise otherwise impermissibly frustrates implementation of the FLSA"—"factors external to the compromise[.]" *Id.* (internal quotation marks removed).

**2.   Fairness Scrutiny**

**a.   Internal Factors**

When evaluating the fairness and reasonableness of the compromise to the employee, courts generally borrow the factors employed in evaluating class action settlements more generally. *Dees*, 706 F. Supp. 2d at 1241. Specifically:

> (1) the existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of Plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994). The Court finds that the proposed Settlement Agreement is fair and reasonable for three chief reasons.

First, the settlement amount is substantial compared to the claimed damages, and appears to reflect a fair compromise in light of the apparent strength of Plaintiffs' case and the range of possible recovery. The Parties have agreed for "a gross amount of $55,000 to be apportioned among the Named Plaintiff and Collective Members in accordance with the schedule attached . . . to this agreement[.]" (Doc. 36-3 at 5). Based on Defendant's records and calculations, "there is $26,712 in alleged unpaid wages" stemming from the deduction of 30-minute meal periods from Collective members' time records. (*Id.* at 14). As the Parties point out, a settlement amount of more than double the alleged unpaid wages approaches the Collective's maximum potential recovery at trial. Although Plaintiffs appear to have a strong case on the merits, obtaining such a substantial recovery by way of a damages award would be far from certain, and fraught with the challenges and uncertainty which accompanies any litigation.

Second, the Settlement Agreement has been negotiated after what appears to be substantial discovery into the underlying merits of Plaintiffs' claim. This discovery included "Defendant's production of, *inter alia*, timesheets, W-2 forms, check stubs, tax documents, schedules, job descriptions, and employee lists for each of Defendant's nine restaurant

locations." (Doc. 36-2 at 12). The Parties therefore should have had a significant mutual understanding as to the relative merits of their respective cases, which will have allowed them to make informed choices in their settlement negotiations.

Third, the Parties are represented by Counsel and there is no evidence of fraud or collusion. In negotiating the preliminary Settlement Agreement, the Parties engaged in an "arms-length mediation" before a mediator. (Doc. 36-5 ¶ 10). At that mediation, both sides were represented by experienced Counsel, (Doc. 36-2 at 10), and the Parties first negotiated the settlement, before reaching an agreement as to attorneys' fees and costs. (Doc. 36-5 ¶ 10).

Taken together, the Court finds that the Settlement Agreement reflects a compromise that is fair and reasonable to the employees involved having considered the factors internal to the compromise.

### b.     External factors

When evaluating whether the compromise impermissibly frustrates the FLSA, a court should consider "an array of 'external' or contextual factors pertinent to the statutory purpose of the FLSA." *Dees*, 706 F. Supp. 2d at 1243–44. Courts should consider factors such as the inclusion of certain provisions in a compromise antithetical to the FLSA, *see Gamble*, 247 F. Supp. 3d at 1305 (rejecting confidentiality provision), a need to definitively resolve an issue affecting similarly situated employees, or a need to address an employer or industry with a history of noncompliance. *Coffield v. Gulf Coast Title Agency, LLC*, No. 3:18cv1986, 2018 72997840, at *1 (N.D. Fla. Oct. 29, 2018) (citing *Dees*, 706 F. Supp. 2d at 1241–43). A district court should "faithfully execute the congressional mandate for 'minimum wages, promptly paid . . . for the lowest paid segment of the nation's workers.'" *Dees*, 706 F. Supp. 2d at 1244 (quoting *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 116 (1946)). Here, having reviewed the Settlement Agreement, the Court finds that its provisions are consistent with the statutory purpose of the FLSA. Thus, the factors external to the compromise likewise counsel approving the Settlement Agreement.

### c.     Conclusion: Fairness Scrutiny

Having reviewed the Settlement Agreement (Doc. 36-3) and the Parties' submissions (Docs. 36-1, 36-2, 36-3, 36-4, & 36-5), the Court finds that the *Dees* factors, both internal and external, demonstrate that the Settlement Agreement is a "fair and reasonable resolution of a

11

bona fide dispute." Accordingly, the Court finds preliminary approval of the Settlement Agreement proper.

### III. CONCLUSION

In sum, the Motion for Preliminary Approval (Doc. 36) is **GRANTED**. As a result, the Court orders the following:

(1) The Court **CONDITIONALLY CERTIFIES** the following class as an FLSA collective action for settlement purposes only, with the Collective defined as:

> All hourly, non-exempt employees who worked at 3 Squares restaurant locations as line cooks or servers, from April 1, 2022 through February 5, 2025, who were subject to the deduction of 30 minute unpaid meal period(s) from their wages.

("the Collective").

(2) The Parties' Settlement Agreement (Doc. 36-3) is **PRELIMINARILY APPROVED**. But the Court declines to make any final determination as to the Settlement Agreement or attorneys' fees until after the appropriate motions for final approval have been filed.

(3) Lemberg Law, LLC is **APPOINTED** as class counsel for the Collective.

(4) CPT Group is **APPOINTED** as the Settlement Claims Administrator.

(5) The Court **AUTHORIZES** the form, content and method of delivering notice to the Collective as set out in the Settlement Agreement (Doc. 36-3 at 11–12, 18–22). Class Counsel and Counsel for Defendant, along with the Settlement Claims Administrator, are authorized to supervise and administer the notice procedure.

(6) The Court **ORDERS** Defendant to provide the Settlement Claims Administrator the following information for all Collective Members: name, social security number, last known address, telephone number and/or email address, and first/last dates of work in relevant position(s) between April 1, 2022, and February 5, 2025, as that information exists on file with Defendant no later than **ten (10) days** from the entry of this Order.

(7) The Court **ORDERS** the Settlement Claims Administrator to mail, by first-class mail, and email, a copy of the Notice of Settlement, substantially in the form included in Exhibit A (Doc. 36-3 at 18–22) to the Settlement Agreement (Doc. 36-3) to all Collective Members who can be identified or located with reasonable effort no later than **thirty (30) days** from the entry of this Order ("the Notice Date").

(8) Potential opt-in plaintiffs shall have **sixty (60) days** from the Notice Date to mail or email any written objection to the Settlement Claims Administrator. Consent forms to join the settlement, and objection to the settlement, must be emailed or postmarked within **sixty (60) days** from when the Notice Packet is mailed and/or emailed by the Settlement Claims Administrator.

(9) The Court **ORDERS** Class Counsel to file a motion for judgment and final approval of the Collective action Settlement Agreement no later than **Wednesday, June 25, 2025**. Class Counsel shall file a motion for a final fairness hearing contemporaneously, if justified.[2]

(10) The Court **ORDERS** Class Counsel to file a motion for award of attorneys' fees, reimbursement of costs and expenses no later than **Wednesday, June 25, 2025.**

**SO ORDERED**, this 25th day of February 2025.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[2] The Parties ask the Court to set a fairness hearing. (Doc. 36-3 at 26). However, the FLSA does not mandate a final fairness hearing, as might be required for a class action under Fed. R. Civ. P. 23(e)(2). *E.g.*, *Mygrant v. Gulf Coast Rests. Grp.*, No. CV 18-0264, 2019 WL 4620367, at *7 (S.D. Ala. Sept. 23, 2019). As such, if the Parties believe that a hearing is otherwise necessary or required, they shall file a motion asserting the same supported by authority and particularized justification.